**ZANGO, INC., Plaintiff,**

v.

**PC TOOLS PTY LTD., Defendant.**

**No. C07–0797–JCC.**

United States District Court,
W.D. Washington,
At Seattle.

June 5, 2007.

Jeffrey I. Tilden, Michael Rosenberger, Gordon Tilden Thomas & Cordell LLP, Seattle, WA, for Plaintiff.

Conor F. Farley, Tarek F. M. Saad, Holland & Hart, Denver, CO, J. Ronald

Sim, Maren Roxanne Norton, Stoel Rives, Seattle, WA, for Defendant.

## ORDER

COUGHENOUR, District Judge.

## I. INTRODUCTION

This matter comes before the Court on Plaintiff's Motion for a Temporary Restraining Order ("TRO") (Dkt. No. 6), Defendant's Opposition thereto (Dkt. No. 19), and Plaintiff's Reply (Dkt. No. 24).

## II. BACKGROUND AND FACTS

The facts are largely undisputed. Plaintiff Zango is an Internet company that "provides consumers free access to a large catalog of online videos, games, music, tools and utilities" sponsored by advertisements. (Pl.'s Mot 3.) Plaintiff Zango also offers a "premium version" of its software that provides the same content without advertisements for a fee.

Defendant PC Tools offers software called "Spyware Doctor," which detects and, in some cases deletes, potentially harmful software ("malware") on its users' computers. Defendant's anti-malware software classifies potentially dangerous or annoying software into various categories. From least risk to greatest, those classifications are: "Potentially Unwanted Applications" ("PUAs"), "low," "medium," "elevated," and "high." (Risk Levels (Dkt. 22–2).)

From 2004 to May 2007, Defendant classified all of Plaintiff's software as malicious with "high" or "elevated" risk. (Def.'s Opp'n 5.) Plaintiff and Defendant had been engaged in ongoing discussions during that time regarding possible reclassification. (Id.)

On March 29, 2007, one version of Defendant's Spyware Doctor software known as Starter Edition was added to Google Pack, which aggregates a number of software applications and offers them for free over the popular Google website. (Pl.'s Mot 4.) Google Pack is widely distributed, and Plaintiff alleges that millions of users have downloaded and installed Defendant's software from Google. (Id.) Plaintiff Zango alleges that Starter Edition of Spyware Doctor interferes with its software in the following ways:

> . . . Starter Edition is disabling Zango installations to the point that existing, consensually installed Zango software already resident on a consumer's computer no longer functions. Further testing revealed that while the Starter Edition software prevents the display of advertisements from Zango on behalf of Zango's advertising partners (which is the primary source of Zango revenue), some existing Zango customers nonetheless are still able to access the content in Zango's catalog (i.e., the movies, games, screensavers, and the like). Starter Edition software damages the Zango application immediately upon installation, without giving any specific notice whatsoever to Zango customers or providing any opportunity for Zango customers to consent or intervene.

(Id.)

On approximately May 14, 2007 and prior to the filing of this lawsuit, Defendant reclassified three of Plaintiff's software programs (Seekmo Search Assistant, Zango Search Assistant, and Hotbar) as "PUAs"—Spyware Doctor's lowest possible classification for potential malware. (Def.'s Opp'n 7.) Around that time, Defendant changed the latest version of its software such that "PUAs" would no longer automatically be removed by its automatic scanning function. (Id.) After this change, these three programs were no longer automatically detected and removed by Defendant's software, though they may still be identified and removed manually. (Def.'s Opp'n 19.) Plaintiff contends that

this change did not provide it with all of the relief it seeks because: (1) prior versions of the software without the new changes are "still available across the internet, even if not from Google," (2) Plaintiff has recently purchased software called "Cyberhawk" from another company that Spyware Doctor also blocks, (3) the new version of Spyware Doctor prevents an upgrade to the "premium version" of Plaintiff's software, and (4) the mere identification of Plaintiff's software harms its reputation. (Pl.'s Reply 5–6.)

While Plaintiff does not dispute that its previous business practices may have been harmful, it argues that it has substantially revamped its software in the past eighteen months, in part due to a settlement with, and oversight by, the Federal Trade Commission ("FTC"). (Pl.'s Reply 2–3) Plaintiff recently settled a formal complaint with the FTC in which it agreed to pay a $3 million fine. The FTC press release described Plaintiff's alleged previous practices and the current settlement as follows:

> . . . Zango often used third parties to install adware on consumers' computers. The adware, including programs named Zango Search Assistant, 180Search Assistant, Seekmo, and n-CASE, monitors consumers' Internet use in order to display targeted pop-up ads. It has been installed on U.S. consumers' computers more than 70 million times and has displayed more than 6.9 billion pop-up ads. The FTC alleges that Zango's distributors—third-party affiliates who often contracted with numerous sub-affiliates—frequently offered consumers free content and software, such as screensavers, peer-to-peer file sharing software, games, and utilities, without disclosing that downloading them would result in installation of the adware. In other instances, Zango's third-party distributors exploited security vulnerabilities in Web browsers to install the adware via "drive-by" downloads. As a result, mil-lions of consumers received pop-up ads without knowing why, and had their Internet use monitored without their knowledge.

> In addition, the agency alleges that Zango deliberately made it difficult to identify, locate, and remove the adware once it was installed. For example, Zango failed to label its pop-up ads to identify their origin, named its adware files with names resembling those of core systems software, provided uninstall tools that failed to uninstall the adware, gave confusing labels to those uninstall tools, and installed code on consumers' computers that would enable the adware to be reinstalled secretly when consumers attempted to remove it.

> . . . .

> The settlement bars Zango from using its adware to communicate with consumers' computers—either by monitoring consumers' Web surfing activities or delivering pop-up ads—without verifying that consumers consented to installation of the adware. It bars Zango, directly or through others, from exploiting security vulnerabilities to download software, and requires that it give clear and prominent disclosures and obtain consumers' express consent before downloading software onto consumers' computers. It requires that Zango identify its ads and establish, implement, and maintain user-friendly mechanisms consumers can use to complain, stop its pop-ups, and uninstall its adware. It also requires that Zango monitor its third-party distributors to assure that its affiliates and their sub-affiliates comply with the FTC order. Finally, Zango will give up $3 million in ill-gotten gains to settle the charges. The settlement contains standard record keeping provisions to allow the FTC to monitor compliance.

FTC Press Release: Zango, Inc. Settles FTC Charges: Will Give Up $3 Million in Ill–Gotten Gains for Unfair and Deceptive Adware Downloads, November 3, 2006, *available at* http://www.ftc.gov/opa/2006/11/zango.shtm (last visited June 4, 2007).[1]

Plaintiff currently seeks "a temporary restraining order, and, ultimately, a preliminary injunction, compelling PC Tools to immediately remove Zango's software programs from the Spyware Doctor detection database." (Pl.'s Mot. 3.)

## III. ANALYSIS

■■■ The standard to obtain a temporary restraining order is the same as that to obtain a preliminary injunction. *See Graham v. Teledyne–Continental Motors, Div. of Teledyne Indus., Inc.,* 805 F.2d 1386, 1388 (9th Cir.1986). To obtain either form of relief, a plaintiff must satisfy either the "traditional" or "alternative" test. Under the traditional test, the Court must find that: (1) the moving party will suffer irreparable injury if the relief is denied, (2) the moving party will probably prevail on the merits, (3) the balance of potential harm favors the moving party, and (4) the public interest favors granting relief. *Cassim v. Bowen,* 824 F.2d 791, 795 (9th Cir. 1987). The alternative test requires the Court to find: (1) a combination of probable success and the possibility of irreparable injury; or (2) that serious questions are raised and the balance of hardships tips sharply in its favor. *Id.* Under this last part of the alternative test, "even if the balance of hardships tips decidedly in favor of the moving party, it must be shown as an irreducible minimum that there is a fair chance of success on the merits." *Johnson v. Cal. St. Bd. of Accountancy,* 72 F.3d 1427, 1430 (9th Cir. 1995). The two prongs of the alternative test are not separate inquiries, but rather "extremes of a single continuum." *Clear Channel Outdoor, Inc. v. City of Los Angeles,* 340 F.3d 810, 813 (9th Cir.2003). "[T]he less certain the district court is of the likelihood of success on the merits, the more plaintiffs must convince the district court that the public interest and balance of hardships tip in their favor." *Southwest Voter Registration Educ. Project v. Shelley,* 344 F.3d 914, 918 (9th Cir.2003).

## A. Likelihood of Personal Jurisdiction

■■■ "Where a challenge to jurisdiction is interposed on an application for a preliminary injunction the plaintiff is required to adequately establish that there is at least a reasonable probability of ultimate success upon the question of jurisdiction when the action is tried on the merits." *Enterprise Intern., Inc. v. Corporacion Estatal Petrolera Ecuatoriana,* 762 F.2d 464, 471 (5th Cir.1985) (internal citations omitted). Here, the Court finds that there is a reasonable probability that the Court has personal jurisdiction over Defendant due to the continuous and systemic business activity it conducts in the forum state.

## B. Irreparable Harm

■■ The Court finds that Plaintiff has demonstrated some degree of irreparable harm. Spyware Doctor's categorization of Plaintiff's software as potential malware threatens Plaintiff's reputation. Further, the software blocks, and in some cases removes, copies of Plaintiff's software. (Pl.s Mot. 11–12.)

The Court finds, however, that the magnitude of the harm is significantly less than suggested by Plaintiff. Defendant

---

**1.** Due to the time constraints involved, the Court may consider this press release even if it does not conform to the rules of evidence.

*See Flynt Distributing Co., Inc. v. Harvey,* 734 F.2d 1389, 1394 (9th Cir.1984).

has recently reclassified Plaintiff's software as a "PUA" and modified its spyware software to allow for "PUAs" to avoid being detected and removed by Defendant's auto-scan. Though the software apparently blocks an upgrade to the "premium version" of Plaintiff's software, Plaintiff concedes that the bulk of its customers use the free, advertising-sponsored version. (*Id.*)

Further, some of the irreparable injury Defendant is suffering does not appear to be redressible by the relief sought. While it may be true that previous versions of Spyware Doctor generally available on the Internet have not implemented the most-recent changes, Plaintiff only seeks a TRO or preliminary injunction in which Defendant will "eliminate all references to Zango's products ... from all products, definition files, and scanning databases *sold, marketed, distributed or otherwise made available by PC Tools,* and provide all existing PC Tools customers, partners, or others utilizing PC Tools' definition files with an updated set of files consistent with the foregoing." (Proposed TRO 4 (Dkt. No. 11) (emphasis added).) In the absence of any evidence to the contrary, the Court is forced to assume for purposes of this time-sensitive motion that Defendant is only distributing the most recent version of its software, that it already has provided an updated version of its newest release to its business partners (as it apparently has done with Google) and, to the extent previous versions of its software are generally available over the Internet, they are not on websites controlled by Defendant. (*See* Pl.'s Mot. 3.) Thus, it is unclear how the proposed modification to the current database could retroactively alter programs generally available on the Internet which it apparently does not distribute. Accordingly, much of this identified harm is not relevant to the instant inquiry because it is not harm that can be rectified by the proposed injunction.

Moreover, though Spyware Doctor also apparently blocks "Cyberhawk" applications that Defendant recently purchased from a third party, the exact nature of this software has not been substantially briefed by either party and thus the amount of injury is speculative at this time.

In short, although the Court finds that Plaintiff is suffering some degree of irreparable harm, it is satisfied that the remedial action Defendant already took has significantly minimized the amount of such harm.

### C. Likelihood of Success on the Merits

■ Plaintiff's complaint alleges (1) tortious interference with contract, (2) a violation of the Washington Consumer Protection Act ("CPA"), and (3) trade libel. (Compl. 6–7 (Dkt. No 1 at 15–16).) Although Plaintiff also alleges general "injunctive relief" and "unjust enrichment" as separate causes of action, it does not argue that these are independent of the three other claims, and the Court will not treat them as such. The Court finds that Plaintiff is unlikely to prevail on the merits of any of these three claims.

■ "[T]ortious interference arises from either the defendant's pursuit of an improper objective of harming the plaintiff or the use of wrongful means that in fact cause injury to plaintiff's contractual or business relationships." *Pleas v. City of Seattle,* 112 Wash.2d 794, 774 P.2d 1158, 1163 (1989). The Court finds it unlikely that Plaintiff will be able to demonstrate that Defendant's conduct in attempting to protect its customers from what it perceives to be potentially harmful or annoying software stems from an "improper" motive or uses any "wrongful" means. Its classification is not unreasonable given Plaintiff Zango's past conduct and in light

of other companies' similar classification of Plaintiff's software.

 To state a claim under the Washington Consumer Protection Act, a plaintiff must prove five elements: (1) unfair or deceptive act or practice, (2) occurring in trade or commerce, (3) public interest impact, (4) injury to plaintiff in his or her business or property, and (5) causation. *Hangman Ridge Training Stables v. Safeco Title Ins. Co.*, 105 Wash.2d 778, 719 P.2d 531 (1986). The Court finds it unlikely that Plaintiff will be able to prove that Defendant's software was unfair or deceptive, given that users knowingly download its software to avoid potential malware. In so doing, users rely on Defendant's expertise in identifying and blocking such software. There is nothing in this case to suggest that this trust has been abused, as is evident by the fact that many similarly situated companies likewise block Zango's software. Further, allowing Defendant to exercise such judgment to avoid the well-documented harm of malware is decidedly in the public interest.

 The Court also finds it unlikely that Plaintiff will prevail on its trade libel claim, assuming such a cause of action even exists in Washington. "To establish a claim of product disparagement, also known as trade libel, a plaintiff must allege that the defendant published a knowingly false statement harmful to the interests of another and intended such publication to harm the plaintiff's pecuniary interests." *Auvil v. CBS 60 Minutes*, 67 F.3d 816, 820 (9th Cir.1995). The Court has serious questions as to whether Plaintiff can demonstrate that any classification by Defendant is false, that its classification is a statement of fact rather than non-actionable opinion, or that Defendant had the requisite intent for this tort.

Accordingly, Plaintiff is unlikely to succeed on the merits of any of its three causes of action in this matter.

### D. Balance of Hardships

 The Court finds that the balance of harms does not favor Plaintiff. Although Plaintiff is suffering some injury to its reputation and due to those software applications that are still interfered with under the most recent version of Spyware Doctor, such as Zango's "premium version" and "Cyberhawk," this harm has been substantially mitigated by the recent changes undertaken by Defendant. Further, this injury is matched by competing harms that would result to Defendant were this Court to order a TRO or preliminary injunction. Defendant's harm consists both in its own reputational interest in being able to properly block software it deems harmful. A Court-imposed injunction would also encourage a flood of similar applications by other companies whose software Spyware Doctor blocks, especially in the context of this case where the ultimate likelihood of success on the merits is low. The probable cumulative effect of such lawsuits would severely hamper Defendant's business. Thus, Plaintiff has failed to demonstrate that the balance of hardships tips in its favor.

### E. The Public Interest Favors Defendant

 As the Court has already discussed, it is in the public interest to allow companies similar to Defendant to be able to exercise their judgment and block potential malware applications. Thus, this factor points in Defendant's favor as well.

\*　　\*　　\*　　\*　　\*　　\*

Given the above analysis, Plaintiff is unable to satisfy either the traditional or alternative test for obtaining either a temporary restraining order or a preliminary injunction.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's motion is DENIED