**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

|  |  |
|---|---|
| RICHARD ZABRISKIE; KRISTIN ZABRISKIE, *Plaintiffs-Appellees*, | Nos. 17-15807 17-16000 |
| v. | D.C. No. 2:13-cv-02260-SRB |
| FEDERAL NATIONAL MORTGAGE ASSOCIATION, *Defendant-Appellant*. | ORDER AND AMENDED OPINION |

Appeals from the United States District Court
for the District of Arizona
Susan R. Bolton, District Judge, Presiding

Argued and Submitted October 18, 2018
San Francisco, California

Filed January 9, 2019
Amended October 8, 2019

Before: J. Clifford Wallace and Susan P. Graber, Circuit
Judges, and Robert S. Lasnik,* District Judge.

---

*\* The Honorable Robert S. Lasnik, United States District Judge for
the Western District of Washington, sitting by designation.*

Order;
Opinion by Judge Wallace;
Dissent by Judge Lasnik

**SUMMARY**[**]

**Fair Credit Reporting Act**

The panel filed (1) an order amending its prior opinion, denying panel rehearing, and denying, on behalf of the court, rehearing en banc; and (2) an amended opinion and dissent. In its amended opinion, the panel reversed the district court's judgment in favor of the plaintiffs in an action under the Fair Credit Reporting Act.

The plaintiffs alleged that the Federal National Mortgage Association, or Fannie Mae, falsely communicated to potential mortgage lenders, via its proprietary software, called Desktop Underwriter, that the plaintiffs had a prior foreclosure on a mortgage account. Prior to a jury trial, the district court ruled, on partial summary judgment, that Fannie Mae was a "consumer reporting agency" within the meaning of the FCRA. The panel held that Fannie Mae was not a consumer reporting agency because, even if it assembled or evaluated consumer information through Desktop Underwriter, it did not act with the purpose of furnishing consumer reports to third parties. Rather, its purpose was to facilitate a transaction between the lender and itself.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel reversed and remanded with instructions to enter judgment in favor of Fannie Mae. It also vacated an award of attorney's fees and costs to the plaintiffs.

Dissenting, Judge Lasnik wrote that when, in addition to reviewing the relevant data and issuing a recommendation on whether it would purchase the loan, Fannie Mae also reported that plaintiffs had a prior foreclosure, it took on the role, and the responsibilities, of a consumer reporting agency.

## COUNSEL

Deanne E. Maynard (argued), Brian E. Matsui, and Seth W. Lloyd, Morrison & Foerster LLP, Washington, D.C.; Michael B. Miller, Morrison & Foerster LLP, New York, New York; for Defendant-Appellant.

Sylvia A. Goldsmith (argued), Goldsmith & Associates, LLC, Rocky River, Ohio; Paul B. Mengedoth, Mengedoth Law PLLC, Scottsdale, Arizona; Jennifer D. Bennett, Public Justice P.C., Oakland, California; for Plaintiffs-Appellees.

Dinita L. James, Gonzalez Law, LLC, Tempe, Arizona, for Amicus Curiae Federal Housing Finance Agency.

Christian Schreiber, Chavez & Gertler LLP, Mill Valley, California, for Amici Curiae National Association of Consumer Advocates and National Consumer Law Center.

Jonathan Weissglass, Law Office of Jonathan Weissglass, Oakland, California, for Amici Curiae Consumer Law Scholars.

John G. Albanese, Berger Montague PC, Minneapolis, Minnesota, for Amici Curiae East Bay Community Law Center, Rubicon Programs, William E. Morris Institute for Justice, National Resource Center on Domestic Violence, National Housing Law Project, National Consumer Law Center, Greater Boston Legal Services Cori & Re-Entry Project, Massachusetts Law Reform Institute, Human Rights at Home Clinic & Harvard Legal Aid Bureau.

Seth E. Mermin and Hanne Jensen, Center for Consumer Law & Economic Justice, UC Berkeley School of Law, Berkeley, California, for Amicus Curiae UC Berkeley Center for Consumer Law & Economic Justice.

Catherine Ruckelshaus, National Employment Law Project, New York, New York, for Amici Curiae National Employment Law Project, JustLeadershipUSA, Towards Justice, Legal Action Center, and Community Service Society of New York.

Robert Ferguson, Attorney General; Shannon Smith, Senior Counsel; Amy Teng, Assistant Attorney General; Office of the Attorney General, Seattle, Washington; Kevin G. Clarkson, Attorney General, Anchorage, Alaska; Xavier Becerra, Attorney General, Sacramento, California; Clare E. Connors, Attorney General, Honolulu, Hawaii; Ellen F. Rosenblum, Attorney General, Salem, Oregon; for Amici Curiae States of Alaska, California, Hawaii, Oregon, and Washington.

Christian Schreiber, Olivier Schreiber & Chao LLP, San Francisco, California, for Amici Curiae National Association of Consumer Advocates, United States Public Interest Research Group Education Fund, Inc., Americans

for Financial Reform Education Fund, Center for Responsible Lending, and Consumer Reports.

Emmy L. Levens, Cohen Milstein Sellers & Toll PLLC, Washington, D.C., for Amicus Curiae Public Rights Project and Supporting Cities.

## ORDER

The opinion filed on January 9, 2019, and published at 912 F.3d 1192, is amended by the opinion and dissent filed concurrently with this order.

With these amendments, Judges Wallace and Graber have voted to deny Appellees' petition for panel rehearing. Judge Lasnik has voted to grant it. Judge Graber has voted to deny Appellees' petition for rehearing en banc, and Judge Wallace has so recommended. Judge Lasnik has recommended granting it.

The full court has been advised of the petition for rehearing en banc, and no judge of the court has requested a vote on it.

Appellees' petition for panel rehearing and rehearing en banc is **DENIED**. No further petitions for panel rehearing or rehearing en banc may be filed.

**OPINION**

WALLACE, Circuit Judge:

Richard and Kristin Zabriskie sued the Federal National Mortgage Association (Fannie Mae) under the Fair Credit Reporting Act (FCRA). The district court, on cross-motions for summary judgment, held that Fannie Mae was a "consumer reporting agency" within the meaning of FCRA. We have jurisdiction under 28 U.S.C. § 1291, and we reverse.

I.

Fannie Mae is a government-sponsored entity that Congress created in 1938. Its mission is to provide liquidity and "stability in the secondary market for residential mortgages." 12 U.S.C. § 1716. To fulfill its mission, Fannie Mae purchases certain mortgage loans from lenders. Specific guidelines and requirements, detailed in a publicly available manual known as the "Selling Guide," dictate which loans Fannie Mae will purchase. Lenders can use the Selling Guide to determine whether Fannie Mae will purchase the loans that they originate. Using the Selling Guide to evaluate a loan's eligibility for purchase is called "manual underwriting."

Lenders also have the option to automate the underwriting process through Fannie Mae's proprietary software, called Desktop Underwriter (DU). DU automatically applies the guidelines and requirements dictated in the Selling Guide. Fannie Mae licenses DU to many different lenders. DU allows a lender to enter information about the borrower and the property that is the subject of the loan. The lender can also contract with credit bureaus—like Equifax, TransUnion, and Experian—to pay

for and import the borrower's credit report into DU. The lender then uses DU to underwrite the loan. DU analyzes all the inputted or imported information, and it generates a report, called DU Findings, on a loan's eligibility for purchase by Fannie Mae. Besides initially creating and then updating the computer code comprising DU, no individual or entity at Fannie Mae is involved in the process of generating DU Findings.

Relevant to the Zabriskies, the Selling Guide states that Fannie Mae will not purchase a loan for a certain period after a borrower experiences a "significant derogatory event," such as a foreclosure. For example, Fannie Mae will not purchase a loan if the borrower experienced a foreclosure within the past seven years. It will not purchase a loan if the borrower experienced a preforeclosure or short sale within the past two years.

The Zabriskies had a "significant derogatory event"—a short sale after defaulting on their prior mortgage. After waiting two years, they attempted to refinance their current mortgage, and a number of lenders used DU to ascertain whether a loan to the Zabriskies would be eligible for purchase by Fannie Mae. Three of the eight DU Findings created in evaluating the Zabriskies' prospective loan incorrectly stated that the loan was ineligible due to a foreclosure reported within the last seven years. It is undisputed that the Zabriskies did not have a prior foreclosure within the last seven years before the DU Findings were generated.

The Zabriskies sued Fannie Mae, arguing that it "falsely communicated to multiple of the Zabriskies' potential mortgage lenders through its electronic platform that they had a prior foreclosure on a mortgage account." They sued under FCRA, which requires a consumer reporting agency

to follow "reasonable procedures to assure maximum possible accuracy" of consumer information.   15 U.S.C. § 1681e(b).

On cross-motions for summary judgment, the district court held that Fannie Mae acts as a consumer reporting agency when it licenses DU to lenders and that it is therefore subject to FCRA.   The case went to trial, and the jury was instructed that "[i]n connection with its actions in this case Fannie Mae is a 'consumer reporting agency,' [and] the DU findings are 'consumer reports.'"   The jury returned a verdict for the Zabriskies, awarding $30,000 in damages.   The district court also awarded the Zabriskies $652,711.72 in attorney's fees and $68,312.18 in costs.   *See id.* § 1681o(a)(2) (shifting fees and costs to the plaintiff "in the case of any successful action to enforce any liability under" FCRA).

On appeal, Fannie Mae argues that it is not liable under FCRA because it is not a consumer reporting agency.

## II.

We review a district court's summary judgment de novo. *Curley v. City of North Las Vegas*, 772 F.3d 629, 631 (9th Cir. 2014).   We must "determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the substantive law."   *Id.* When cross-motions for summary judgment are at issue, we evaluate "each motion separately, giving the nonmoving party in each instance the benefit of all reasonable inferences."   *ACLU of Nev. v. City of Las Vegas*, 466 F.3d 784, 790–91 (9th Cir. 2006) (internal quotation marks omitted).

### III.

### 1.

FCRA defines a consumer reporting agency as "any person which . . . [1] regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers [2] for the purpose of furnishing consumer reports to third parties." 15 U.S.C. § 1681a(f).  Without question, Fannie Mae is a "person" under FCRA.  *Id.* § 1681a(b) ("The term 'person' means any individual, partnership, corporation, trust, estate, cooperative, association, government or governmental subdivision or agency, or other entity").  While the parties dispute both elements of the statutory definition, we only address the second element.  We therefore assume, without deciding, that Fannie Mae assembles or evaluates consumer information.

To be a consumer reporting agency, Fannie Mae must assemble or evaluate consumer information with "the purpose of furnishing consumer reports to third parties." *Id.* § 1681a(f).  A "consumer report" is any communication by a consumer reporting agency "bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility" for credit, insurance, employment, or other statutorily enumerated reasons. *Id.* § 1681a(d)(1).

Fannie Mae argues that, even if it assembles or evaluates consumer information as a result of DU, it does not do so for the purpose of furnishing consumer reports to third parties. It argues that its only purpose is to "facilitat[e] a transaction

between the lender and Fannie Mae." We agree with Fannie Mae.

"Purpose" means "something set up as an object or end to be attained," or "intention." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/purpose (last visited Nov. 20, 2018). And "'purpose' corresponds loosely with the common-law concept of specific intent." *United States v. Bailey*, 444 U.S. 394, 405 (1980). By its plain meaning, therefore, FCRA applies to an entity that assembles or evaluates consumer information with the intent to provide a consumer report to third parties. *See Kidd v. Thomson Reuters Corp.*, 925 F.3d 99, 104 (2d Cir. 2019) ("The meaning of 'for the purpose of' in § 1681a(f) is therefore plain: A 'consumer reporting agency' is an entity that intends the information it furnishes to constitute a 'consumer report.'" (citation omitted)).

This interpretation aligns with 2010 guidance from the Federal Trade Commission. That guidance provides examples of when an entity acts "for the purpose of furnishing consumer reports to third parties." *Id.* at 106, *quoting* Fed. Trade Comm'n, 40 Years of Experience with the Fair Credit Reporting Act, 2011 WL 3020575, at *23 (2011). The guidance explains that a creditor does not become a consumer reporting agency merely by "communicating consumer report information about a loan applicant" to "an actual or potential loan insurer or guarantor to determine whether" that entity will provide insurance or a guarantee. Fed. Trade Comm'n, 2011 WL 3020575, at *23. There, "the creditor's purpose"—its specific intent—"is to use the report information to consummate the loan transaction for which the consumer applied." *Id.* Like the Second Circuit, we conclude that the guidance is "helpful

and, as it tracks the language of the statute, persuasive." *Kidd*, 925 F.3d at 106.

The Zabriskies argue that we must interpret "purpose" objectively to encompass "the end result" or effect on consumers of issuing DU Findings.  *See W. Watersheds Project v. Interior Bd. of Land Appeals*, 624 F.3d 983, 987 (9th Cir. 2010) (determining the purpose of an adjudication by considering the adjudication's "end result"); *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 947 (9th Cir. 2013) (interpreting the phrase "force feeding a bird for the purpose of enlarging the bird's liver beyond normal size" to cover "the objective nature of the force feeding").  Because some lenders will inevitably use DU Findings to determine whether to issue a loan in the first place—*i.e.*, to determine whether a consumer is creditworthy—the Zabriskies argue that Fannie Mae acts for the purpose of furnishing consumer reports to third parties.

This argument ignores FCRA's text, which defines a consumer reporting agency as a "person" that performs certain acts "for the purpose of furnishing consumer reports to third parties."  15 U.S.C. § 1681a(f).  That is, the "person" must have an intent to furnish consumer reports to third parties.  In contrast, *Canards* and *Western Watersheds* considered the "purpose" of an inanimate *process*, rather than of an *actor* capable of possessing specific intent.

*Western Watersheds* addressed whether the plaintiff's administrative appeal of an agency's decision to issue grazing permits "was an adjudication for the purpose of granting or renewing a license."  624 F.3d at 986 (internal quotation marks omitted).  We held that it was, reasoning that the statutory text at issue required "interpreting the 'purpose' of an adjudication to be defined by the objective nature of the agency action in question, rather than the

subjective motives of the challenging party." *Id.* at 987; *see also id.* ("The more natural reading of whether an adjudication is 'for the purpose of granting or renewing a license' looks to what the end result of the adjudication ultimately will be, which in this case is the renewal or non-renewal of a grazing permit").

Similarly, *Canards* addressed a challenge to a California statute that prohibited selling any product that was "the result of force feeding a bird for the purpose of enlarging the bird's liver beyond normal size." 729 F.3d at 947, *quoting* Cal. Health & Safety Code § 25982. The plaintiffs argued that "purpose" referred to a farmer's subjective intent in feeding his birds, rendering the statute unconstitutionally vague. *Id.* We disagreed because "for the purpose of" in the statute modified the phrase "force feeding a bird." *Id.* "The natural reading of 'force feeding a bird for the purpose of enlarging the bird's liver beyond normal size' is a description of the objective nature of the force feeding, rather than the subjective motive of the farmer." *Id.* (citation omitted). Neither an adjudication nor a force-feeding is a "person" capable of possessing specific intent. Thus, *Canards* and *Western Watersheds* do not control.

Here, Fannie Mae provides DU for the same reason it provides the Selling Guide: to help lenders determine whether Fannie Mae will purchase the loans that they originate. *Cf.* 12 U.S.C. § 1716 (limiting Fannie Mae's purpose to the secondary market for residential mortgages). DU's output is exclusively based on information provided to it by lenders and credit bureaus. DU contains no evaluation or new information about the borrower's creditworthiness

that was not already provided by the lender or credit bureau.[1] There is nothing in the record to suggest that Fannie Mae assembles or evaluates consumer information—assuming that it does so—with any specific intent other than to determine a loan's eligibility for later purchase by Fannie Mae.  Fannie Mae's purpose is not to furnish a consumer report to lenders.

The Zabriskies highlight how lenders use DU before a loan is originated and how Fannie Mae has a separate process and internal software to determine whether to purchase an actual loan.  They argue that these facts belie the true purpose of DU, which is to furnish a consumer report to lenders.  This argument is unpersuasive.  That Fannie Mae makes both a predictive and an actual determination of a loan's eligibility for purchase does not change our analysis.  The goal of either determination is the same: to convey to lenders whether Fannie Mae will purchase the loan.

2.

The Zabriskies urge us to construe FCRA liberally so that the statutory definition of consumer reporting agency encompasses Fannie Mae.  It is true that FCRA's "consumer oriented objectives support a liberal construction" of the statute.  *Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995) (citation omitted).  FCRA "was crafted to protect consumers from the transmission of inaccurate information about them" and "to establish credit reporting practices that utilize accurate, relevant, and current

---

[1] The dissent highlights that "DU reported a foreclosure that did not appear in any data previously submitted."  The "foreclosure" message in DU meant that a consumer's credit report included a certain Manner of Payment code provided by a credit bureau.

information in a confidential and responsible manner." *Id.* (citations omitted).

But "it is quite mistaken to assume . . . that whatever might appear to further [a] statute's primary objective must be the law." *Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1725 (2017) (internal quotation marks omitted). Rather than "presume" that "any result consistent with [a party's] account of the statute's overarching goal must be the law," we must "presume more modestly instead that the legislature says what it means and means what it says." *Id.* (internal quotation marks and alterations omitted); *see also United States v. Albertini*, 472 U.S. 675, 680 (1985) (interpreting a statute "must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose" *quoting Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985)). Under the plain meaning of the statute, even if Fannie Mae engages in assembling or evaluating consumer information, it does not do so for the purpose of furnishing a consumer report to lenders.

Aspects of FCRA's statutory scheme suggest that Congress intended to exclude Fannie Mae from the definition of consumer reporting agency. *See King v. Burwell*, 135 S. Ct. 2480, 2496 (2015) ("A fair reading of legislation demands a fair understanding of the legislative plan"). FCRA imposes several duties on consumer reporting agencies, one of which is to follow "reasonable procedures to assure maximum possible accuracy" of consumer information. 15 U.S.C. § 1681e(b). The Zabriskies contend that Fannie Mae violated this duty.

If we were to hold that Fannie Mae is a consumer reporting agency, it would be required to comply with the other FCRA duties to borrowers.  Indeed, FCRA also requires consumer reporting agencies to provide a variety of disclosures to consumers. *See, e.g.*, *id.* § 1681g(a) (duty to disclose information in the consumer's file and the source of that information upon request); *id.* § 1681g(c)(2) (duty to provide a summary of rights with respect to any written disclosure made as required by FCRA); *id.* § 1681h(c) (duty to provide trained personnel to explain to the consumer any information given to him).  That interpretation would contradict Congress's design for Fannie Mae to operate only in the secondary mortgage market, to deal directly with lenders, and not to deal with borrowers themselves. *See* 12 U.S.C. §§ 1716, 1719.  FCRA itself appears to make a distinction between Fannie Mae and consumer reporting agencies. *See* 15 U.S.C. § 1681g(g)(1)(B)(ii) (stating that a mortgage lender should disclose a credit score generated by Fannie Mae using the procedures applicable to credit scores *not* obtained from consumer reporting agencies).

## IV.

We hold that Fannie Mae is not a consumer reporting agency because, even if it assembles or evaluates consumer information through DU, it does not do so for the purpose of furnishing consumer reports to third parties.  Accordingly, the district court erred by granting the Zabriskies' motion for summary judgment and by denying Fannie Mae's cross-motion on this issue.  We reverse and remand with instructions to enter judgment in favor of Fannie Mae.  Because Fannie Mae is not liable under FCRA, we also vacate the award of attorney's fees and costs to the Zabriskies.

**REVERSED in part, VACATED in part, and REMANDED**.   Costs on appeal awarded to Defendant-Appellant.

---

LASNIK, District Judge, dissenting:

The Fair Credit Reporting Act (FCRA) was the "product of congressional concern over abuses in the credit reporting industry." *Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995) (citing *St. Paul Guardian Insurance Co. v. Johnson*, 884 F.2d 881, 883 (5th Cir. 1989)). Its "legislative history . . . reveals that it was crafted to protect consumers from the transmission of inaccurate information about them . . ." *Id*. (citing *Kates v. Croker National Bank*, 776 F.2d 1396, 1397 (9th Cir. 1985)). This case arose because the Federal National Mortgage Association (Fannie Mae) issued reports stating that the Zabriskies had a prior foreclosure when they did not. As a result of the error, they were unable to secure refinancing of the mortgage on their house between May 2012 and August 2013. This is exactly the kind of harm that the Act was designed to prevent.

I.  *Background*

Eight Desktop Underwriter (DU) Findings were generated at the request of lenders who were considering making a loan to the Zabriskies. The reports were based in part on credit information generated by the consumer reporting agencies Equifax, TransUnion and Experian. The credit information contained Manner of Payment (MOP) Codes, which indicate whether an account is current or past due. There was no uniformity in the industry on how these Codes were used, however, and Fannie Mae knew this. It

also knew that there was no Code for a short sale. Despite the lack of uniformity and the lack of a short sale code, Fannie Mae programmed DU so that an MOP Code 9 would always be interpreted as a "collection or charge-off" and would trigger a message stating that DU had identified a foreclosure or a deed-in-lieu of one.

In April 2008, the Zabriskies had a successful short sale of their home, meaning that the home was sold for less than the debt secured by the property and the lien holder agreed to accept less than the full amount owed. The short sale was reported on all of the reports obtained from the consumer reporting agencies, with remarks indicating that the creditor had agreed to accept the sale amount in satisfaction of the debt. The consumer reporting agencies coded the short sale in various ways, including three uses of MOP Code 9. No report mentioned a foreclosure, and the Zabriskies never had one. Op. at 7. Fannie Mae ignored the consumer reporting agencies' remarks and the known ambiguity regarding the use and meaning of MOP Codes and interpreted the three instances of MOP Code 9 as evidence of a foreclosure. Those three DU Findings correctly identified a short sale, but also stated that DU had identified a foreclosure. The DU Findings were issued to the lenders with "Refer with Caution" recommendations. As a result of the DU Findings, two lenders denied the Zabriskies' loan applications, even though Kristin Zabriskie had informed them that she and her husband had executed a short sale, not a foreclosure.

As the district court noted, had Fannie Mae simply reviewed the relevant data and issued a recommendation on whether or not it would purchase the loan, there would likely be no plausible claim under the FCRA. But when Fannie Mae took the additional step of reporting that the Zabriskies had a prior foreclosure—i.e., reporting consumer credit

information—it took on the role, and the responsibilities, of a consumer reporting agency.

## II. *Congress's Intention With Regard To Fannie Mae*

As the majority correctly points out, the FCRA differentiates between Fannie Mae and consumer reporting agencies in § 1681. Op. at 15; *see* 15 U.S.C. §§ 1681g(1)(B)(ii); 1681(1)(C) (distinguishing between a credit score "generated by an automated underwriting system used by [Fannie Mae]" and one "provided by a consumer reporting agency"). However, this is in a section of the Act from whose application Fannie Mae and DU Findings are already expressly excluded. *Id.* § 1681g(g)(1)(G) ("As used in this subsection, the term "person" does not include [Fannie Mae]"); *id.* § 1681g(f)(2)(A) (excluding DU Findings from the definition of a "credit score"). Fannie Mae is referred to as something other than a consumer reporting agency because, for the purposes of this section, it is excluded from the definition of a consumer reporting agency. For all other purposes and sections, however, Fannie Mae is a "person" that may, depending on its activities, be subject to the FCRA. *Id.* § 1681a; *see* Op. at 9. This Court has previously rejected the majority's conclusion that Fannie Mae cannot be a consumer reporting agency, albeit in an unpublished memorandum.[1] "Reading [§ 1681g] in context, [the Court] [saw] no indication that Congress intended to exclude Fannie Mae from the definition of "consumer reporting agency,"

---

[1] *See* Ninth Circuit Rule 36-3 (providing that unpublished dispositions "are not precedent" except when relevant under the "law of the case" doctrine or for claim or issue preclusion). The memorandum disposition was a reversal of the district court's decision in *McCalmont v. Fed. Nat. Mortg. Ass'n*, No. 2:13-CV-2107-HRH, 2014 WL 3571700, at *5 (D. Ariz. July 21, 2014).

and [declined] to read such an intent into the statute." *McCalmont v. Fed. Nat'l Mortg. Ass'n*, 677 F. App'x 331, (Mem) 332 (9th Cir. 2017). The fact that Fannie Mae is explicitly excluded from § 1681g but not excluded or even referred to anywhere else in the Act supports the *McCalmont* holding. "When Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)).

The purpose of the FCRA was to "protect consumers against inaccurate and incomplete credit reporting." *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1155–56 (9th Cir. 2009) (citing *Nelson v. Chase Manhattan Mortg. Corp.*, 282 F.3d 1057, 1060 (9th Cir. 2002)). "[T]he legislative record includes pages of discussion of how such inaccuracies may harm consumers . . ." *Robins v. Spokeo, Inc.*, 867 F.3d 1108, 1114 (9th Cir. 2017), *cert. denied*, 138 S. Ct. 931, 200 L. Ed. 2d 204 (2018). Fannie Mae's issuance of a "Refer with Caution" recommendation does not automatically prevent a loan from being made, but Fannie Mae is aware that many lenders elect not to manually underwrite loans when they receive a cautionary recommendation from DU.[2]

---

[2] A "Refer with Caution" recommendation indicates that the loan does not meet Fannie Mae's standards. As DU's recommendation is based upon an evaluation of the same credit data on which a lender bases its decision on whether or not to issue a loan, it is understandable that a lender would interpret Fannie Mae's rejection as an indication that something about the borrower or the loan makes it a risky transaction. Moreover, the recommendation means that Fannie Mae is unlikely to purchase the loan. That means that the lender's capital will be tied up, rendering it unable to issue more loans. This is why most lenders choose

Given the real world consequences of Fannie Mae's consumer credit reporting activities and the absence of any indication that Congress meant to exclude Fannie Mae from the FCRA's reach except where it did so explicitly, there is no reason to suspect that Congress intended for the type of inaccuracies that occurred in this case to proliferate unchecked. *See Banneck v. HSBC Bank USA, N.A.*, No. 15-CV-02250-HSG, 2016 WL 3383960, at *5 (N.D. Cal. June 20, 2016) (noting that "Fannie Mae's DU software caused widespread problems in the credit reporting industry."). As the majority acknowledges, Op. at 13, the Act's "consumer oriented objectives support a liberal construction of [it]." *Guimond*, 45 F.3d 1329, 1333 (9th Cir. 1995) (citing *Kates*, 776 F.2d at 1397).

### III. *Fannie Mae's Purpose is to Furnish Consumer Reports to Third Parties*

The FCRA defines a consumer reporting agency as "any person which . . . [1] regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers [2] for the purpose of furnishing consumer reports to third parties". 15 U.S.C. § 1681a(f). The majority assumes, without deciding, that Fannie Mae assembles and evaluates consumer information. It proceeds directly to the second element, holding that the purpose of DU Findings is only to inform lenders of whether or not Fannie Mae will purchase a loan, so as to facilitate a transaction between the lender and itself. Op at 9. With respect, I disagree.

In an effort to show that Fannie Mae's purpose is not to furnish a consumer report to a third party, the majority finds

---

to simply deny a borrower's application when Fannie Mae issues a "Refer with Caution" rather than take a risk.

that the DU Findings contain no "new information regarding the borrower's creditworthiness that wasn't already provided by the lender or credit bureau." *Id.* at 12–13. That is inaccurate. As the district court noted, it is undisputed that DU reported a foreclosure that did not appear in any data previously submitted.

Furthermore, DU Findings do not consist only of a recommendation on whether or not Fannie Mae will purchase a loan. The Findings are generally five or six pages long and include information about the loan, the property, the consumer's credit history and credit scores, any risk factors, existing credit and liabilities, the consumer's employment and income, a proposed monthly payment, guidance to lenders, and conditions for Fannie Mae's approval. This is far beyond a thumbs up or down indication. It is "information . . . bearing on a consumer's credit worthiness." 15 U.S.C. § 1681(d). And it is for that reason that DU Findings is "used . . . for the purpose of serving as a factor in establishing the consumer's eligibility for . . . credit." *Id.* Lenders submit their requests for DU Findings prior to their decisions on whether or not to issue a loan, and use DU's extensive credit risk assessment in making that decision. The majority finds the chronology irrelevant, Op. at 13, but even the individual responsible for DU stated that the ability "to determine Fannie Mae's eligibility *before* a lender makes a particular loan . . . encourages the making of more mortgage loans to borrowers." DU Findings is, in short, a consumer report. 15 U.S.C. § 1681(d). As Fannie Mae is the entity that furnishes it, Fannie Mae is a consumer reporting agency. *Id.* § 1681(f).

Fannie Mae argues, that even if lenders *do* use DU Findings to make decisions on whether or not to issue a loan, that is not Fannie Mae's purpose. *Id.* § 1681(f). Rather, its

purpose is to facilitate a transaction between the lender and potential borrower. Fannie Mae asserts that it is what the Consumer Financial Protection Bureau (CFPB) calls a "joint user" of the credit information. CFPB's Supervision and Examination Manual (Aug. 2018) (CFPB Manual) at 782. As Fannie Mae and the lender "are jointly involved in the decision to approve a consumer's request for a product or service," they can share consumer credit information without becoming consumer reporting agencies. *Id.* This is unpersuasive. Fannie Mae's participation ends at the point at which it provides its consumer report to the lender. The lender certainly uses Fannie Mae's DU Findings in making a decision on whether or not to issue a loan to a borrower, but it does not in any way involve Fannie Mae as an entity in that decision. Fannie Mae is no more a joint user than Equifax or TransUnion.

Nor does Fannie Mae's role as an agent of the lender, *infra* at  26, suggest otherwise. *See* Fed. Trade Comm'n, 40 Years of Experience with the Fair Credit Reporting Act, 2011 WL 3020575, at \*24 (2011) (FTC Guidelines). Fannie Mae cites only to a single out-of-circuit case that accepted that argument. *Weidman v. Fed. Home Loan Mortg. Corp.*, 338 F. Supp. 2d 571, 575 (E.D. Pa. 2004) ("[Freddie Mac] is sharing consumer reports with the lender, its principal, and assisting the principal by evaluating the consumer's credit information. As a matter of law, [it] satisfies the definition of a joint user, and is consequently not subject to the FCRA's provisions relating to consumer reporting agencies). It has since been discredited. *Adams v. Nat'l Eng'g Serv. Corp.*, 620 F. Supp. 2d 319, 327 (D. Conn. 2009) (noting the limited deference accorded to the FTC Guidelines, and finding the FTC's "joint user" exception contrary to Congress's purpose in enacting the FCRA). The majority also points out that the FTC Guidelines state that a creditor does not "become a

consumer reporting agency merely by 'communicating consumer report information about a loan applicant' to 'an actual or potential loan insurer or guarantor to determine whether' that entity will provide insurance or a guarantee." Op. at 10 (quoting FTC Guidelines at *23). However, that portion of the Guidelines applies only to the provision of "consumer report information about a loan applicant to an entity that *must* participate in the transaction in order for it to be completed." FTC Guidelines at *23 (emphasis added). Fannie Mae does not suggest that its participation is mandatory for the transaction to be completed. Indeed, it (necessarily) argues the very opposite: that any bearing DU Findings has on the lender's decision is unintentional and unanticipated.

Ultimately, DU has three possible recommendations: Approve/Eligible, Approve/Ineligible, and Refer with Caution. Approve/Eligible means that the risk of the loan is acceptable, and it is eligible for delivery to Fannie Mae. Approve/Ineligible means that that the risk of the loan is acceptable, but it is not eligible for delivery to Fannie Mae. If Fannie Mae's purpose were only to communicate whether or not it will purchase a loan, or to facilitate a transaction, two recommendations, Eligible or Ineligible, would suffice. It is because Fannie Mae's purpose is to furnish consumer reports to third parties so that they may make informed lending decisions that DU Findings includes two separate recommendations with an "Approve" component, as distinguished from the "Refer with Caution" recommendation. This use of DU Findings by lenders is, therefore, much more than an inadvertent "end result" or side effect. Op. at 11 (citing *W. Watersheds Project v. Interior Bd. of Land Appeals*, 624 F.3d 983, 987 (9th Cir. 2010)). Fannie Mae "specifically intend[s]" to furnish a consumer report. *Kidd v. Thomson Reuters Corp.*, 925 F.3d 99, 103 (2d

Cir. 2019).[3] Fannie Mae itself acknowledges that an important part of its role in the market is to provide stability and liquidity to mortgage lenders and "encourage[] the making of more mortgage loans to borrowers." It is, therefore, a consumer reporting agency. 15 U.S.C. § 1681a(f).

### IV. *Fannie Mae Assembles and Evaluates Consumer Credit Data*

#### 1. *Liability of a Software Provider for the Software*

Having concluded that Fannie Mae's purpose in issuing DU Findings reports is to "furnish[] consumer reports to third parties", *id.*, I turn now to the first element of the FCRA's definition of a consumer reporting agency; namely, whether Fannie Mae "regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers". *Id.*[4] I conclude that it does. It is undisputed that DU uses reference numbers provided by lenders to reach out to consumer reporting agencies and pull credit data (*i.e.*, assembling) and that it then evaluates that data using algorithms established by Fannie Mae (*i.e.*, evaluating) to generate a report and

---

[3] The Second Circuit's decision in *Kidd*, to which the majority refers, Op. at 10, concerned whether Thomson Reuters qualified as a consumer reporting agency under the FCRA. The Second Circuit concluded that it did not, as it did not specifically intend to furnish a consumer report. *Kidd*, 925 F.3d at 103. It is worth noting that Thomson Reuters had specifically "prohibit[ed] its subscribers from using its software for any purpose covered by the FCRA, such as credit inquiries or background checks related to employment, and ha[d] established measures to prevent those uses of its reports." *Id.* at 102.

[4] The majority does not reach this portion of the definition. Op. at 9.

recommendation for the lenders. The issue is whether these activities are attributable to Fannie Mae or whether the lenders who subscribe to DU and request DU Findings are the "persons" who are assembling and processing consumer information for the purposes of the FCRA.[5]

First, it is worth noting that the FCRA itself makes reference to "an automated underwriting system *used by* [Fannie Mae] . . ." 15 U.S.C. § 1681g(g)(1)(A)(ii) (emphasis added). *See also Shaw v. Experian Info. Sols., Inc.*, 891 F.3d 749, 758 (9th Cir. 2018) ("[T]he record . . . indicates that the inaccurate reporting of Appellants' short sales *was due to Fannie Mae's mistreatment of Experian's coding . . .*") (emphasis added).

However, this issue has not yet received much attention in the courts. In the only Ninth Circuit decision to consider whether Fannie Mae assembles and evaluates consumer credit information through DU, this Court found, on identical facts, that the plaintiff's complaint "contain[ed] sufficient plausible allegations to raise the reasonable inference that Fannie Mae . . . qualifies as a "consumer reporting agency." *McCalmont*, 667 F. App'x (Mem) at 332.[6] Fannie Mae also acknowledges that it has a continuing

---

[5] There are references to the case file being "used internally by Fannie Mae employees," but appellees have not established that any "individual or entity is involved in the process of generating DU Findings." Op. at 7.

[6] Fannie Mae relies on two out-of-circuit cases. In the first, *Barnes v. DiTech.Com*, No. 03-CV-6471, 2005 WL 913090 (E.D. Pa. Apr. 19, 2005), the parties agreed that Fannie Mae was not a consumer reporting agency and the court erroneously held that even DU itself does not evaluate credit data. *Barnes* at *4 no. 20, *5. The second, *Thomas v. Cendant Mortg.*, No. CIV.A. 03-1672, 2004 WL 2600772 (E.D. Pa. Nov.

role in DU's operations. It does not simply sell or license a software program to third parties to do with as they please. Rather, Fannie Mae enters into a Software Subscription Agreement, which states that Fannie Mae is the "Licensee's agent" and "shall" obtain consumer credit data for the purpose of evaluating the data and making an underwriting recommendation. There are also several internal guides and other documents[7] that suggest that Fannie Mae considers itself to be processing the data when DU Findings are requested. *Id*. Furthermore, the assembling and evaluating takes place on Fannie Mae's network. Lenders can only access DU through a portal on www.FannieMae.com or an integrated third-party loan origination system. Consumer reporting agencies submit data over the "Fannie Mae network." They pay Fannie Mae $1 for each consumer report, and a monthly fee for connectivity to the DU platform. The evidence shows that lenders essentially subscribe to a service provided by Fannie Mae rather than simply purchasing a software program. In fact, it was Fannie Mae that ultimately chose to resolve the inconsistency and ambiguity in DU's use of MOP Code 9 as indicating a foreclosure.[8]

---

15, 2004), was decided on a record that was less developed than the one here. Neither case contained any evidence that the lender had relied on DU's results when making its lending decision. *Thomas* at \*9; *Barnes* at \*5.

[7] These include Fannie Mae's "Credit Agencies System Integration Guide," Fannie Mae's "Risk Analysis Scope Document (RASD) for FMCA 2012 and Mortgage Scorecard Model 12.0." and the Software Subscription Agreement.

[8] In 2013, Fannie Mae re-coded its software, allowing for the identification of short sales in response to certain Remarks Codes and for a lender to instruct DU to disregard an erroneous finding of a foreclosure.

Fannie Mae finds support in the guidelines issued by the FTC for its conclusion that it is the lenders who assemble and evaluate credit information when they request DU Findings. The FTC opined that "[a] seller of software to a company that uses the software product to process credit report information is not a [consumer reporting agency] because it is not 'assembling or evaluating' any information.'" FTC Guidelines at 29. The FTC's opinion was based on a staff letter. FTC Guidelines at 12–13, 29; *see* Cast, FTC Informal Staff Opinion Letter (Oct. 27, 1997) (FTC Letter). However, the situation considered by the FTC is substantively different than that which gave rise to the Zabriskies' claims. First, as noted above, Fannie Mae does not sell (or license) DU outright. It retains control over the software product and, acting as the licensee's agent, uses it to assemble and evaluate credit report information upon a lender's request and pursuant to the terms of the Software Subscription Agreement. Fannie Mae is not, therefore, a "seller of software to a company that uses the software product." The FTC hypothetical also assumes that the software provider would "no longer ha[ve] any connection at all to the information." FTC Letter. This is in stark contrast to Fannie Mae, which retains a strong connection with the processed information. The connection is not, as appellees argue, a function of Fannie Mae's continuing role in designing and updating DU's functionality. Rather, it is because DU produces a recommendation on whether or not *Fannie Mae*—the software provider itself—will ultimately purchase the loan that its own software analyzed for eligibility. Fannie Mae's connection to and interest in the DU Findings supports the conclusion Fannie Mae itself has drawn: that it, rather than the lenders, uses DU to obtain consumer credit information and generate a lending recommendation.

Fannie Mae's tool analogy is unpersuasive because it does not take into account Fannie Mae's acknowledged role in fulfilling a request for DU Findings or its interest in those Findings. To the extent DU can be analogized to a mechanical tool such as a laser measurer, it would be as if Fannie Mae allowed licensees to purchase access to measurements obtained with the tool, but did the measuring itself. The subscriber would identify the gap it wanted measured, and Fannie Mae would point the laser, record the findings, and provide a report including both the raw measurements and a recommendation regarding whether the distance was appropriate or inappropriate for a given use. In this analogy, Fannie Mae has an interest in controlling the measurement and evaluation process because, unless the licensee can show error, Fannie Mae will ultimately rely on its own readings and recommendations when determining whether to, say, fund the licensee's project. A company like Google, on the other hand, does not act as a licensee's agent when its search engine is queried, nor does it have an interest in the results generated by the search engine. Had Google created DU, the district court would have had to consider whether there was evidence that Google was the one assembling and evaluating data at a customer's request (as opposed to the user independently using a program it purchased or licensed) and/or whether DU produces an output of any relevance to Google (which could give rise to an inference that Google, rather than the customer, is responsible for the evaluation on which it will ultimately rely).

Fannie Mae has characterized itself in this litigation as nothing more than a software developer providing a technological resource to lenders. It ignores its outsized role in mortgage lending and mortgage markets, its control over the use of the technology, and its keen interest in the

creditworthiness of the consumers whose information DU assembles and evaluates. The characterization of Fannie Mae as a software provider is a smokescreen, akin to Uber Technologies, Inc.'s attempt to masquerade as a technology company rather than a transportation company. *O'Connor v. Uber Techs., Inc.*, 82 F. Supp. 3d 1133, 1141 (N.D. Cal. 2015); *see also Couser v. Pre-paid Legal Servs., Inc.*, 994 F. Supp. 2d 1100 (S.D. Cal. 2014). Fannie Mae is not a "technology company" in any real sense of the phrase: the realities of Fannie Mae's activities and interests related to DU cannot be so easily brushed aside or hidden behind a label.[9]

## 2. *Manual Underwriting and the Granting of a Waiver*

The majority states that DU "automatically applies the guidelines and requirements dictated by the Selling Guide" to determine whether a loan is eligible for purchase by Fannie Mae. Op. at 6. As the district court observed, however, the Selling Guide directs lenders to consider certain factors, but does not direct how they should be considered. DU, on the other hand, applies Fannie Mae's

---

[9] The cases cited by appellants, none of which concern the FCRA, are inapposite. In *Zango, Inc. v. Kaspersky Lab, Inc.*, the Ninth Circuit distinguished between a software user engaging in an activity and a software engaging in the activity. 568 F.3d 1169, 1176 (9th Cir. 2009). But it made no comment on whether the software provider was liable for its software. *Id.* In *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, the Supreme Court found the distributors of software products indirectly liable for copyright infringement, in part because the direct infringers were so numerous that "the only practical alternative [was] to go against the distributor . . ." 545 U.S. 913, 928–30 (2005) (citing *In re Aimster Copyright Litig.*, 334 F.3d 643, 645–46 (7th Cir. 2003)). Here, there is no one else "to go against." *Id.* As the district court pointed out, if Fannie Mae is not held liable, the Zabriskies are left with no recourse.

proprietary algorithms to generate recommendations from the factors. The district court correctly concluded that a lender cannot replicate DU's results simply by following the Selling Guide. *Id.* Fannie Mae itself advises lenders that, "[f]or a more precise or definitive recommendation for determining whether to deliver a given mortgage to Fannie Mae, the lender should submit the mortgage application to DU."

It is for that reason that Fannie Mae treats the results of a manual underwriting and DU Findings differently. In a manual underwriting, because it is the *lender* who is engaged in the evaluation, the lender is required to make various representations and warranties to Fannie Mae. But when the lender relies on DU, Fannie Mae waives those requirements. If a lender manually underwriting a loan would always reach the same result as DU, there would be no reason to have additional requirements or to grant a waiver. The waiver mechanism further indicates that it is Fannie Mae, rather than the lender, who is engaged through DU in the "assembling and evaluating" of information when a lender submits a request for DU Findings. 15 U.S.C. § 1681a(f).

V. *Conclusion*

This Court has observed that, "given the ubiquity and importance of consumer reports in modern life—in employment decisions, in loan applications, in home purchases, and much more—the real-world implications of material inaccuracies in [the] reports seem patent on their face." *Robins*, 867 F.3d at 1114. To hold that Fannie Mae is not a consumer reporting agency is to deny consumers any sort of recourse from these grave and consequential errors.

For the foregoing reasons, I must respectfully dissent.